UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
MICHAEL MCDERMOTT and DOUGLAS FINNEGAN,
*Individually, and on behalf of all others similarly situated*,

                                    Plaintiff,

                 -against-

THE FEDERAL SAVINGS BANK, JOHN T. CALK,
and STEVE CALK,

                                 Defendants.
---------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
14-CV-6657-WFK-SJB

**BULSARA, United States Magistrate Judge:**

        Plaintiffs Michael McDermott ("McDermott") and Douglas Finnegan

("Finnegan") commenced this action individually and on behalf of a putative collective

and class on November 8, 2019 against Defendants The Federal Savings Bank ("TFSB"),

John T. Calk ("J. Calk"), and Steve Calk ("S. Calk") (collectively "Defendants"), alleging

violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and the

New York Labor Law ("NYLL").  Plaintiffs are loan originators, often referred to as loan

officers, that work for a division of TFSB, DE Capital, pursuant to a Marketing Services

Agreement ("MSA") entered between TFSB and Douglas Elliman Real Estate.  (Mem. in

Supp. of Pls.' Mot. for Rule 23 Class Certification dated Nov. 8, 2019 ("Pls.' Mem."), Dkt.

No. 152, at 3; Marketing Services Agreement dated Mar. 21, 2014 ("MSA"), attached as

Ex. 1 to Decl. of Justin M. Reilly dated Sept. 18, 2019 ("Reilly Decl."), Dkt. No. 152).

Plaintiffs now move for certification a NYLL class consisting of 49 loan officers who

worked for DE Capital ("MSA Loan Officers" or "Plaintiffs") pursuant to Rule 23(b)(3) of

the Federal Rules of Civil Procedure.  (Pls.' Mot. to Certify Class of Loan Originators

dated Nov. 8, 2019 ("Pls.' Mot."), Dkt. No. 152).  Twenty-five of the putative class

members have filed consent forms to join this action—in order to assert FLSA claims—and thus are already parties in this case.  (Pls.' Mem. at 4).  The Honorable William F. Kuntz, II referred the instant motion to the undersigned for a report and recommendation.  For the reasons stated below, it is respectfully recommended that the motion for class certification be denied.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On November 12, 2014, McDermott, who worked as a loan officer for Defendants, commenced this putative collective and class action against his former employer, TFSB and individual defendants J. Calk and S. Calk, for the alleged failure to pay minimum and overtime wages in willful violation of FLSA and the NYLL.  (Compl. dated Nov. 12, 2014, Dkt. No. 1, ¶¶ 1, 45–47).

On May 20, 2016, Plaintiffs moved for conditional certification of a nationwide FLSA collective before the Honorable Gary R. Brown, (Mot. to Certify FLSA Collective Action dated Sept. 21, 2015, Dkt. No. 47); that motion was granted, *see McDermott v. Fed. Sav. Bank (McDermott I)*, No. 14-CV-6657, 2016 WL 11531717, at *7 (E.D.N.Y. May 20, 2016).  Judge Brown's order was subsequently modified by the Honorable Joan M. Azrack.  *See McDermott v. Fed. Sav. Bank (McDermott II)*, No. 14-CV-6657, 2018 WL 1865916, at *1 (E.D.N.Y. Apr. 18, 2018).  Judge Azrack's modification limited the FLSA collective and distribution of notice to loan originators who worked in New York pursuant to the MSA.  *See id.* at *6.  On May 23, 2018, Plaintiffs' counsel provided collective action notice to approximately 48 additional plaintiffs, and 14 additional loan officers joined the case.  *See McDermott v. Fed. Sav. Bank (McDermott III)*, No. 14-CV-6657, 2018 WL 6718599, at *2 (E.D.N.Y. Sept. 28, 2018), *report and recommendation adopted*, *McDermott v. Fed. Sav. Bank (McDermott IV)*, 2019 WL 1305992 (Mar. 22,

2019).  The notice was sent more than three years after the termination of these 14 plaintiffs' employment with Defendants (none had continued employment past March 31, 2015), and consequently the statute of limitations for their FLSA claims had expired. *McDermott III*, 2018 WL 6718599, at *2.  Plaintiffs moved to equitably toll the limitations period; the motion was denied.  *Id.* at *7; *McDermott IV*, 2019 WL 1305992, at *3.  As a result, eight months later, Plaintiffs moved for class certification of Plaintiffs' NYLL claims to avail themselves of the six-year statute of limitations under the NYLL. (Pls.' Mot.).  The facts in support of the class motion are set forth below.

TFSB is a federally chartered bank with offices throughout the United States. (Am. Compl. dated Dec. 18, 2014, Dkt. No. 13, ¶ 11).  On March 21, 2014, TFSB entered into the MSA with Douglas Elliman, a real estate broker with multiple locations in New York.  (*See* MSA at 1); *McDermott II*, 2018 WL 1865916, at *2.  The MSA was in effect from March 2014 through the end of March 2015.  (*See* Dep. of Mordecai Husarsky dated July 18, 2019 ("Pls.' Husarsky Dep."), attached as Ex. 3 to Reilly Decl., Dkt. No. 152, at 19:15–:17).  The MSA covered Douglas Elliman offices in the counties of New York, Queens, Kings, Nassau, Suffolk, and Westchester, New York and gave access to TFSB to these offices and its real estate agents there.  (*Id.* at 41:11–42:07).  In return, TFSB paid Douglas Elliman $25,000 a month in fees and approximately $25,000 a month in guaranteed dividends.  (*Id.* at 23:18–:23; MSA § 5.1(a)).

In 2014, TFSB created a separate division, DE Capital (*id.* at 15:25–16:08), and hired loan officers to work for the division (*id.* at 16:09–:11).  Under the terms of the MSA, loan officers of DE Capital had access to the Douglas Elliman offices and agents. (*Id.* at 17:09–19:12).  By having access to Douglas Elliman offices, the hope was that loan officers and real estate agents would form relationships, and the real estate agents

3

would refer home buyers to the loan officers for mortgages. (Dep. of Ace Watanasuparp dated Jan. 15, 2016 ("Pls.' Watanasuparp Dep."), attached as Ex. 2 to Pls.' Reply in Supp. of Mot. ("Pls.' Reply"), Dkt. No. 153, at 48:25–49:10; Dep. of Irina Pashinsky dated Apr. 24, 2019 (Pls.' Pashinsky Dep."), attached as Ex. 17 to Reilly Decl., Dkt. No. 152, at 14:13–:16 ("Q:  So the purpose of you going to those [Douglas Elliman] offices is to essentially sell through those realtors?  A:  Correct.")).  TFSB's goal was to have one quarter (of the transactions where the realtor represented the buyer) referred to a TFSB loan officer.  (Dep. of Thomas Drew dated Nov. 20, 2015 ("Pls.' Drew Dep."), attached as Ex. 3 to Pls.' Reply, Dkt. No. 153, at 69:02–:07 ("So the primary goal for each real estate office, was what they called the capture rate, so our focus was to get each Douglas Elliman office to at least 25 percent capture of the buy side transactions, where the realtor represented the buyer in the transaction."); Dep. of Steven Lefkowitz dated Nov. 20, 2015 ("Pls.' Lefkowitz Dep."), attached as Ex. 4 to Pls.' Reply, Dkt. No. 153, at 24:03–:08; Pls.' Watanasuparp Dep. at 49:05–:09 ("Q: [W]as the goal to have these loan officers working directly in the Douglas Elliman offices . . . so that they could get the loans from the real estate agents' customers?  A:  Yes.")).

From February 2014 to March 2015, there were 49 loan officers who worked for TFSB pursuant to the MSA.  (Dep. of Mordechai Husarsky dated July 18, 2019, attached as Ex. E to Defs.' Resp. in Opp. to Pls.' Mot. ("Defs.' Resp."), Dkt. No. 154, at 17:20–18:13).  Their primary duties were to originate mortgage loans.  (Am. Compl. ¶¶ 18–19).  The loan officers serviced approximately 30 to 40 Douglas Elliman offices in Manhattan, Queens, Nassau, and Suffolk Counties.  (Dep. of Steven Lefkowitz dated Nov. 20, 2015 ("Defs.' Lefkowitz Dep."), attached as Ex. D to Defs.' Resp., Dkt. No. 154, at 28:23–:25).  Loan officers were assigned to Douglas Elliman offices based on geographic location and

feedback from Douglas Elliman managers and had varying supervisors depending on their assigned office.  (Dep. of Thomas Drew dated Nov. 20, 2015 ("Defs.' Drew Dep."), attached as Ex. A to Defs.' Resp., Dkt. No. 154, at 30:04–30:13).  Ace Watanasuparp served as the President of the DE Capital Division.  (Dep. of Ace Watanasuparp dated Jan 15, 2016 ("Defs.' Watanasuparp Dep."), attached as Ex. B to Defs.' Resp., Dkt. No. 154, at 12:19–13:04).

All 49 loan officers were classified as exempt from FLSA and the NYLL as outside salespeople regardless of which office they worked at and whether they conducted most of their work inside the office or outside the office.  (Am. Compl. ¶ 100); *see also McDermott I*, 2016 WL 11531717, at *2 ("[I]t is undisputed that in all relevant respects, FSB treated outside loan officers similarly throughout its various regions and offices.").  While working for TFSB, loan officers were paid exclusively through commissions.  (Pls.' Husarsky Dep. at 49:14–:17).  They did not receive an additional hourly wage, overtime pay, or salary.  (*Id.* at 49:18–50:02).  Loan officers only received pay when a loan that they worked on closed and was funded.  (*Id.* at 50:03–:06).  If the loans they worked on did not close and get funded, they received no compensation at all.  (*Id.* at 50:07–:10).  Defendants contend that loan officers were well compensated through commissions, with some earning six-figure annual incomes.  (Ronald Riemer W2 Forms dated 2014 and 2015, attached as Ex. F to Defs.' Resp., Dkt. No. 154).

Plaintiffs claim that TFSB wrongfully classified the Loan Officers as exempt from the overtime provisions of FLSA and the NYLL under the outside salesperson exemptions of FLSA and NYLL.  (Pls.' Mot. at 6).  Defendants contend that whether each loan officer was properly classified requires individual inquiries into each person's daily schedules because officers had complete autonomy over how they spent their days and

kept no records as to time worked.  (Defs.' Resp. at 4–5).  For the reasons explained

below, the motion for class certification should be denied.[1]

DISCUSSION

Class certification is governed by Federal Rule of Civil Procedure 23.  "Rule 23

does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

338, 350 (2011).  Plaintiffs seeking class certification under Rule 23 must satisfy each of

the conditions of Rule 23(a) and must demonstrate that their action fits within one of

the three categories of Rule 23(b).  *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41

(2d Cir. 2006).  "The party seeking 'class certification must affirmatively

demonstrate . . . compliance with the Rule,' and a district court may only certify a class if

it 'is satisfied, after a rigorous analysis,' that the requirements of Rule 23 are met."  *In re

Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (quoting *Wal-Mart*,

564 U.S. at 350).  "Rigorous analysis" means that:

> (1) a district judge may certify a class only after making determinations that
> each of the Rule 23 requirements has been met; (2) such determinations can
> be made only if the judge resolves factual disputes relevant to each Rule 23
> requirement and finds that whatever underlying facts are relevant to a
> particular Rule 23 requirement have been established and is persuaded to
> rule, based on the relevant facts and the applicable legal standard, that the
> requirement is met; (3) the obligation to make such determinations is not
> lessened by overlap between a Rule 23 requirement and a merits issue, even
> a merits issue that is identical with a Rule 23 requirement; (4) in making
> such determinations, a district judge should not assess any aspect of the
> merits unrelated to a Rule 23 requirement; and (5) a district judge has
> ample discretion to circumscribe both the extent of discovery concerning
> Rule 23 requirements and the extent of a hearing to determine whether such
> requirements are met in order to assure that a class certification motion
> does not become a pretext for a partial trial of the merits.

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d at 41.

---

[1] In light of these conclusions, this report does not address the remaining
elements of Rule 23(a) or the requirements of Rule 23(b)(3).

Under Rule 23(a), plaintiffs must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These requirements are referred to as numerosity, commonality, typicality, and adequacy.  In addition, Rule 23(a) has been held in this Circuit to contain an implicit requirement of "ascertainability."  *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017) ("The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries.").  Plaintiffs must satisfy each of these requirements by a preponderance of the evidence.  *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *Novella v. Westchester County*, 661 F.3d 128, 148–49 (2d Cir. 2011).  Here, the class does not satisfy either the numerosity or commonality requirement, and therefore class certification should be denied.

Numerosity

Rule 23(a)(1) requires that the prospective class be so numerous that joinder is "impracticable."  "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder."  *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *see also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Impracticable does not mean impossible.").

Although "numerosity is generally presumed when the prospective class consists of 40 members or more," *Alcantara v. CNA Mgmt., Inc.*, 264 F.R.D. 61, 64 (S.D.N.Y.

2009), "[t]here is no 'magic number' which automatically determines whether or not the numerosity requirement is met.  A court must use its discretion to decide the issue on the basis of the circumstances of each case," *Ewh v. Monarch Wine Co.*, 73 F.R.D. 131, 133 (E.D.N.Y. 1977).  *See also* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2020) ("[T]here is no definite standard as to what size class satisfies Rule 23(a)(1)."); *Robidoux*, 987 F.2d at 936 ("Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers.").

> [C]ourts have not allowed a class action to be brought even when there were twenty-nine, thirty-nine, fifty to one hundred, or even three hundred and fifty potential members. . . .  A variety of factors, including the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute may contribute to the court's decision under Rule 23(a)(1) in a given case.

7A Wright & Miller § 1762.

> [T]he Second Circuit lists the following other considerations for finding numerosity:  "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members."

*In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 107 (D. Conn. 2005) (quoting *Robidoux*, 987 F.2d at 936).  Additionally, "[k]nowledge of names and existence of members has been called the 'most important' factor [in establishing numerosity], precisely because it renders joinder practicable."  *Forde v. Waterman S.S. Corp.*, No. 12-CV-3396, 2013 WL 5309453, at *6 (S.D.N.Y. Sept. 18, 2013) (quoting *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410–11 (S.D.N.Y. 1998)).

Here, Plaintiffs have not met their burden of establishing numerosity for the putative class.  Plaintiffs rely exclusively on the fact that the class is composed of 49

members to argue that numerosity has been met.  (Pls.' Mem. at 8).  But the size of the class is just one of many factors the Court must consider, and here, the size of the class alone is insufficient to justify a class action and demonstrate that joinder is impractical.

Plaintiffs are geographically concentrated, and their names and whereabouts are known.  The putative class members all worked out of New York offices pursuant to the MSA between TFSB and Douglas Elliman.  (*Id.* at 2, 4; Pls.' Husarsky Dep. at 41:11–42:03).  The "most important factor"—contact information for class members—weighs entirely against a class action:  unlike in many large class actions, Plaintiffs' counsel has a list of all 49 loan officers with their full names, dates of hire and termination, addresses, and phone numbers.  (*See* Distribution List dated July 18, 2019, attached as Ex. 2 to Reilly Decl., Dkt. No. 152, at 1).  According to this list all class members reside in the tristate area in either New York, New Jersey, or Connecticut.  (*Id.*).  Indeed, 25 of the 49 class members have already filed consents to join the action, (Pls.' Mem. at 4), pursuant to the collective action.  And in so doing, they are already parties in the case. *See Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 915 (5th Cir. 2008) ("FLSA allows an employee to bring a claim on behalf of other similarly-situated employees, [and] the other employees do not become plaintiffs in the action unless and until they consent in writing."); *Marichal v. Attending Home Care Servs., LLC*, 432 F. Supp. 3d 271, 278 (E.D.N.Y. 2020) ("[E]very plaintiff who opts in to a collective action has *party status*." (quoting 7B Wright & Miller § 1807)).  They are therefore already part of the case and

can assert any claim made by any of the original named plaintiffs, including NYLL claims.[2]

The Court sees no practical reason why Plaintiffs' counsel cannot join the other 24 members of the putative class. There is no evidence that the size of the putative class members' claims or their financial ability prohibits them from bringing their own suits. Accordingly, the Court finds that joinder is not impracticable and numerosity has not been satisfied. *See, e.g.*, *Primavera*, 178 F.R.D. at 411–12 (denying class of 38 to 40 potential plaintiffs where the identity and whereabouts of all potential class members were known such that plaintiffs could easily contact potential litigants and propose joinder to their actions); *Deen v. New Sch. Univ.*, No. 05-CV-7174, 2008 WL 331366, at *3–5 (S.D.N.Y. Feb. 4, 2008) (denying proposed class of 110 members where Plaintiffs provided insufficient evidence to show that the proposed class was geographically dispersed and lacked the financial resources to join the suit or were otherwise incapable of bringing individual suits); *Moore v. Trippe*, 743 F. Supp. 201, 211–12 (S.D.N.Y. 1990) (denying proposed class of 54 members where all members had been identified and all lived in the metropolitan New York area, albeit in different states).

---

[2] The statute of limitations periods for these claims and any plaintiffs who joined would have been tolled during the pendency of the class action (*i.e.*, from the filing of the complaint containing putative class claims until this decision recommending denial becomes final) pursuant to *American Pipe*. *McCabe v. Lifetime Ent. Servs.*, *LLC*, No. 17-CV-908, 2018 WL 1521860, at *6 (E.D.N.Y. Jan. 4, 2018) ("[W]hen a named plaintiff files a class action, the statute of limitations period is tolled for the individual claims of each of the other class members. That tolling extends until 'class action status [has been] denied.'" (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974))), *report and recommendation adopted,* 2018 U.S. Dist. LEXIS 51077 (Mar. 26, 2018), *aff'd*, 761 F. App'x 38 (2d Cir. 2019).

<u>Commonality</u>

Commonality exists if plaintiffs' claims share a common question of law or fact.

Fed. R. Civ. P. 23(a)(2).  This requires the "plaintiff to demonstrate that the class

members 'have suffered the same injury,'" *Wal-Mart*, 564 U.S. at 350 (quoting *Gen.*

*Tele. Co. v. Falcon*, 457 U.S. 147, 157 (1982)), not "merely that they have all suffered a

violation of the same provision of law," *id*. (noting that the language of Rule 23(a)(2)

"easy to misread, since any competently crafted class complaint literally raises common

questions" (quotations and alteration omitted)).  That is,

> [i]t asks not simply whether there are questions of law or fact common to
> the class, but whether a class action is capable of "generat[ing] common
> *answers* apt to drive the resolution of the litigation." . . . [T]here must be "a
> common contention . . . of such a nature . . . that determination of its truth
> or falsity will resolve an issue that is central to the validity of each one of the
> claims in one stroke."

*Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 162 (S.D.N.Y. 2014) (second, third, fifth,

and sixth alterations in original) (quoting *Wal-Mart*, 564 U.S. at 350); *Marcus v. AXA*

*Advisors, LLC*, 307 F.R.D. 83, 96 (E.D.N.Y. 2015) ("What matters to class

certification . . . is not the raising of common 'questions' . . . but, rather the capacity of a

classwide proceeding to generate common answers apt to drive the resolution of the

litigation." (alterations in original) (quoting *Wal-Mart*, 564 U.S. at 350)); *see also Jacob*

*v. Duane Reade, Inc.*, 289 F.R.D. 408, 414–15 (S.D.N.Y. 2013) ("[T]he commonality

question before this Court at the class certification stage is whether the record evidence

demonstrates a likelihood that common answers will be determined via a class action

approach, or conversely, whether differences among . . . [plaintiffs] will necessarily

generate individualized, rather than common, determinations as this litigation moves

forward.").  Ultimately, in deciding whether commonality exists, "the issue becomes

whether dissimilarities between the claims may impede a common resolution." 7A Wright & Miller § 1763.

"Because Rule 23 requires a court to make determinations relating to the 'claims or defenses' of the parties, it is necessary to specify just what those claims and defenses are." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 155 (S.D.N.Y. 2008). Here, Plaintiff's motion seeks certification of a class of 49 loan officers. Plaintiffs' main contention is that loan officers were wrongfully classified as exempt "outsides salesmen" under the NYLL and that, because of this wrongful classification, they did not receive minimum hourly wages or overtime pay. (Pls' Mem. at 6; Am. Compl. ¶¶ 95–102, 107–10). Instead, the loan officers were only paid when the loan they worked on was closed and funded. (Pls.' Mem. at 6). If the loan did not close, they were not paid at all. (*Id.*). Defendants' defense is that determination as to whether class members were properly classified as outside salespersons cannot be determined through common inquiries and require individualized determinations. (Defs.' Resp. at 1).

Under the NYLL, employers must pay all employees minimum wage and overtime pay at a rate one and one-half times their regular rate of pay. N.Y. Lab. Law § 650, *et seq.*; N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2. However, an individual is not an "employee" under the NYLL if he or she is an "outside salesperson." N.Y. Lab. Law § 651(5); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(a), (c)(5). An outside salesperson is "an individual who is customarily and predominantly engaged away from the premises of the employer, and not at any fixed site and location, for the purpose of: (i) making sales; (ii) selling and delivering articles or goods; or (iii) obtaining orders or contracts for service or for the use of facilities." N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14(c)(5). Outside salespersons, by virtue of not being employees, are not

entitled to NYLL minimum and overtime wage protections.  *Id.*; *Marcus*, 307 F.R.D. at 94 ("Because New York's overtime provision applies only to employees, outside salespersons are not eligible for overtime.").  Indeed, "[t]he outside salesman 'exemption is premised on the belief that exempt employees typically earn[ ] salaries well above the minimum wage and enjoy[ ] other benefits that set them apart from the nonexempt workers entitled to overtime pay.'"  *Torrenegra v. Grameen Am., Inc.*, No. 15-CV-3153, 2017 WL 1401291, at *8 (E.D.N.Y. Apr. 19, 2017) (alterations in original) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 166 (2012)).

In determining whether the NYLL "outside salesperson" exclusion applies, courts apply the "Outside Sales Exemption" from FLSA.  *Cangelosi v. Gabriel Bros.*, No. 15-CV-3736, 2015 WL 6107730, at *2 (S.D.N.Y. Oct. 15, 2015) (applying federal definition of "outside salesman" to overtime and minimum wage claims under the NYLL); *Marcus*, 307 F.R.D. at 94–95 (finding that the NYLL "away from the office" requirement follows the federal definition); *Gold v. N.Y. Life Ins. Co.*, No. 09-CV-3210, 2011 WL 2421281, at *3 (S.D.N.Y. May 19, 2011) (stating that NYLL is "defined and applied in the same manner" as FLSA and applying the federal definition of "outside salesmen" to NYLL).

An outside salesperson under FLSA is a person who is "customarily and regularly engaged 'away from the employer's place or places of business.'"  29 C.F.R. §§ 541.502, 541.500(a)(2) ("The term 'employee employed in the capacity of outside salesman' . . . shall mean any employee . . . [w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.").  In turn, an employer's place of business is "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales."  *Id.* § 541.502. "Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or

13

for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property." *Id.*

The parties do not dispute that there is a common question for all 49 class members—namely, whether they were properly classified as outside salespersons, instead of employees, and thereby not entitled to overtime or minimum wages.

This alone, however, is insufficient to satisfy the commonality requirement, because it does not demonstrate that liability can be resolved through common facts across all class members as opposed to individualized inquiries about each potential class member's status. *Callari v. Blackman Plumbing Supply, Inc.*, 307 F.R.D. 67, 76 (E.D.N.Y. 2015) ("The presence of common questions is not sufficient to satisfy commonality."); *cf. Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 21 (2d Cir. 2013) ("[A]s Citizens points out, many of the declarations submitted to the district court—from ABMs [Assistant Branch Managers], bank managers, regional managers, and others—if credited, suggested that the ABM's primary duties varied in respects material to whether they were exempt or non-exempt employees. These factual disputes are relevant to the determination whether Cuevas has presented a claim that is capable of class-wide resolution, and, to the extent they are material, must be resolved before a Rule 23(a) determination may be made."); *Velasquez v. Digit. Page, Inc.*, 303 F.R.D. 435, 442 (E.D.N.Y. 2014) ("[C]ertification in exemption cases may be appropriate in cases 'where company wide documents and policies tended to show that plaintiffs' jobs were similar in ways material to the establishment of exemption criteria,' but not where there are outstanding factual issues on whether the individual plaintiffs were exempt." (quoting *Cuevas*, 526 F. App'x at 22) (internal quotation marks omitted)).

Indeed, the parties dispute whether this legal question can be answered by a "common answer" based on facts generally applicable to the entire class. Defendants contend that because the "outside salesperson" exclusion turns on whether the loan officers were "customarily and regularly engaged away from the employer's place or places of business," resolution would require an individualized and fact-intensive analysis of for each and every loan officer. (Defs.' Resp. at 10–11). There were no uniform, company- or office-wide requirements or policy on how loan officers must spend their time, and class members each had different supervisors who imposed different requirements and expectations of time spent in and out of the office. (*Id.* at 16–17). Many loan officers had complete autonomy on determining their work schedules—whether they worked in or out of the office—and had the concomitant ability to source business either from real estate agents (inside the office) or independent from agents; it is impossible to certify a class. (*Id.*). Plaintiffs, on the other hand, argue discovery demonstrated that loan officers spent most of their time at the Douglas Elliman office or the TFSB office (Pls.' Reply at 4–5) and that this provides a "common answer" as to whether class members were outside salespersons.

The key factual circumstances on which the outside salesperson status turns appear to differ from class member to class member, and therefore, certification is inappropriate. To be sure, there is evidence in the record of certain common practices for loan officers. The President of the MSA Division testified that loan offers were encouraged to spend as much time as possible at either Douglas Elliman or TFSB. (Pls.' Watanasuparp Dep. at 48:23–49:03). Watanasuparp also testified that they were required to be at the Douglas Elliman offices at least three days a week. (*Id.* at 45:16–:19). Fourteen loan officers testified that they spent a large portion of their days

at either TFSB or Douglas Elliman.  (*See, e.g.*, Dep. of Nancy Cleary dated Apr. 26, 2018 ("Pls.' Cleary Dep."), attached as Ex. 11 to Pls.' Reilly Decl., Dkt. No. 152, at 31:09–:10 ("I have to spend as much time as I can in those offices."); Decl. of Lisa White dated Aug. 26, 2019, attached as Ex. 10 to Reilly Decl., Dkt. No. 152, ¶ 6 ("During my employment with TFSB, I performed all of my work at the Douglas Elliman offices with the exception of Sunday, when I worked a few hours from a home office.")).

However, whether the salesperson exclusion applies, that is, whether a plaintiff "customarily and regularly engaged away from the employer's place or places of business," does not turn solely on the time spent in or out of the office.  "[T]he phrase 'customarily and regularly' [under FLSA] is not a majority of the time test. . . .  Rather, the pertinent inquiry is whether the employee performs tasks critical to the sales process away from the office on a greater than occasional basis."  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 620 (E.D. Va. 2014) (collecting cases) (relying, in part, on a U.S. Department of Labor opinion, which noted that "there is no suggestion . . . that work performed customarily or regularly must occupy any given percentage of an employee's working hours").  The "frequency . . . must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."  29 C.F.R. § 541.701.  An employee can qualify for the outside salesperson exemption even if he or she spends just "one or two hours a day, one or two times a week" away from the employer's premises.  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter at 1, 4 (Jan. 25, 2007); *accord Taylor v. Waddell & Reed, Inc.*, No. 09-CV-2909, 2012 WL 10669, at *3 (S.D. Cal. Jan. 3, 2012); *see, e.g.*, *Lint v. Northwestern Mut. Life Ins. Co.*, No. 09-CV-1373, 2010 WL 4809604, at *3 (S.D. Cal.

Nov. 19, 2010) (finding that spending 10 to 20% of the time outside of the office engaged in sales activity is sufficient to qualify for outside salesperson status).  And "the fact that an employee performs significant work inside the office does not bar the exemption" because an "employee is properly classified as an outside sales employee if the activities occurring outside of the office are critical to the sales process and occur on a consistent basis." *Hantz*, 11 F. Supp. 3d at 620 (quotations omitted); *Marcus*, 307 F.R.D. at 94–95 (rejecting an interpretation of the NYLL that "customarily and predominantly" means that employees must be away from office 50% of the time to qualify as an outside salesperson).

In other words, that most, if not all, class members were required to spend a certain number of days at Defendants' offices or a "large portion" of days at Defendants' offices is not dispositive of outside salesperson status.  Instead, what the loan officers did and whether they performed critical tasks related to a mortgage transaction at the office or outside, as well as the relative amount of time spent in each location, determine whether the loan officer is an outside salesperson.

The parties appear to agree that a loan officer's tasks involve client cultivation and the closing of a particular loan.  (Defs.' Resp. at 6–7; Pls.' Mem. at 5).  How a particular loan officer cultivated clients varied from officer to officer and office to office—and this necessarily affected how the officer spent his or her time.  Some loan officers testified that they received almost all of their clients from Douglas Elliman affiliates and therefore were expected to be there all the time.  (Pls.' Cleary Dep. at 31:09–:13 ("I have to spend as much time as I can in those offices. . . .  Because I have to be in [the realtors'] face all the time."), 33:05–:08 ("Q: [I]n order to make money, it is important to you to spend as much time as possible at the Douglas Elliman offices?  A:

Yes.")).  Others stated that they got most of their clients from sources outside of Douglas Elliman and thus did not need to spend as much time at the offices.  (Dep. of Irina Pashinsky Dep. dated Apr. 24, 2019 ("Defs.' Pashinsky Dep."), attached as Ex. H to Defs.' Resp., Dkt. No. 154, at 10:04–:06 ("[M]ore than fifty percent deals [of my] came, and . . . still come, from my own old connections."), 9:03–:05 ("So I don't need to go anywhere.  I could sit home and people call me and I could write the deals.")).

Each supervisor had different expectations about how a loan officer was to generate new business, and this affected how the employee spent his or her time (Defs.' Lefkowitz Dep. at 28:25–29:08 ("[E]ach manager had a different mentality as far as what they were looking for from a loan officer's presence, some were looking for more constant presence.  Some were more interested in the business that was done out of the office and it wasn't as much of a requirement for the loan officer to be present.")).  As such, some supervisors required loan officers to be at the Douglas Elliman office two to three times a week at a minimum with one day at the TFSB office, while others apparently imposed no such requirements.[3]  (*Compare* Pls.' Watanasuparp Dep. at 48:9–:12 ("Q:  And did you impress upon these loan officers to work out of [the Douglas Elliman] locations at least three days a week and possibly more?  A:  Yeah."), *and* Defs.' Drew Dep. 37:3–:4 ("I expected him to go at least three days a week.  That was the minimum."), 37:13–:14 ("Q:  So you say one day for working at the [TFSB] Babylon office; is that correct?  A:  Yes."), 38:4–:11 ("I would want them to have at least a minimum of five hours in [the Douglas Elliman] office . . . [but] I didn't want a loan

---

[3] Plaintiffs were supervised by Douglas Elliman managers.  (Defs.' Lefkowitz Dep. at 28:16–:21 ("Q:  But was there an expectation from the Douglas Elliman manager at these locations that there would be a loan officer present working at the location for at least a majority of the day?  A:  Some yes, some no.")).

officer sitting there if nobody else was there, it wasn't productive."), *with* Defs.'
Lefkowitz Dep. 17:21–:24 ("Q:  And were loan officers required to work, as far as you
know, work out of Douglas Elliman's offices on a daily basis?  A:  No."), 29:05–:08
("Some were more interested in the business that was done out of the office and it
wasn't as much of a requirement for the loan officer to be present."), *and* Defs.' Drew
Dep. at 70:13–:22 ("[S]ometimes just the mere presence doesn't get you the business,
you have to take it a step further , . . . you need to not just sit at a desk and stare at the
wall, you need to get up and walk around or meet realtors at the open houses . . .
because in many cases just merely sitting there wasn't going to get you there.")).

     When it came to meeting a client, loan officers varied in where and how they
conducted these tasks.  Some loan officers testified that they met clients in the offices,
whereas others said they sometimes met clients elsewhere, including at their homes, or
at an open house.  (*Compare* Pls.' Chen Dep. at 46:15–:17 ("Did [face-to-face meetings
with clients] ever happen in any place other than The Federal Savings Bank office or the
Douglas Elliman office?  A:  No."), *with* Defs.' Pashinsky Dep. at 48:21–:22 ("Some
clients were coming to my house."), *and* Dep. of Glenn Mack dated Aug. 20, 2015,
attached as Ex. 15 to Pls.' Mot., Dkt. No. 152, at 78:12–:25 (stating that he attended open
houses with real estate brokers as well as closings for all of his clients); Dep. of Glenn
Mack dated Aug. 20, 2015, attached as Ex. K to Defs.' Resp., Dkt. No. 154, at 24:04–:05
(stating that he would attend open houses one to twice a week, a few hours a day)).

     As a result, to determine whether a particular loan officer was an outside
salesperson, the Court would have to conduct a detailed, individualized inquiry.  *Marcus
v. AXA Advisors, LLC* is instructive.  *In Marcus*, plaintiffs who worked across eleven
offices in New York, sought to certify a class of former investment advisors who they

alleged were misclassified as independent contractors and outside salesmen.  307 F.R.D. at 87, 90–91.  As to the class members classified as outside salespersons, because there was "substantial variation" with respect to "the amount of time they spent outside of the office in sales meetings;" with a "great deal of flexibility" and "varying approaches to conducting sales meetings," including where meetings were held; the Court concluded plaintiffs could not satisfy the commonality requirement:  "a putative class member's eligibility for inclusion in the class would be based on a myriad of individualized determinations about the agent's sales activity."  *Id.* at 98–99

Similarly, here, to determine whether Plaintiffs were improperly classified as outside salespersons, the Court would have to understand the nature of their clients— whether they were preexisting or not, whether they were developed in office or elsewhere—along with each putative officer's work habits—their supervisor's expectations and policies, which affected the amount of actual time spent in or out of the office; in addition to the breakdown of actual hours worked and the location of that work.  The need for such an individualized factual determination for each class member means that the common legal question—whether an officer was an outside salesperson— does not have an easy and "common answer."  Thus, the Court finds that individualized inquiries predominant in the instant case and as such, Plaintiffs have not met their burden of establishing that class certification is appropriate.  *See, e.g.*, *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 956, 959 (9th Cir. 2009) (reversing order certifying class of loan officers because evidence of a "uniform exemption policy" as outside salesmen was insufficient—individual inquiries into where individual employees actually spent their time would be necessary); *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 400 (W.D.N.Y. 2013) ("Because the plaintiffs' claims pertain to different SMRs in

different locations, under different managers, who performed duties outside of their offices to varying degrees and in different ways, the plaintiffs' claims—as well as any determinations to be made concerning damages—are too highly individualized to form the basis for a class action."); *cf. Anderson v. NVR, Inc.*, 300 F.R.D. 116, 119 (W.D.N.Y. 2014) (denying collective certifications because determination as to whether each plaintiff was "customarily and regularly" engaged away from the employer's place of business involves individual inquiries, the results of which will vary depending on supervisor, location, and performance expectation).

<u>CONCLUSION</u>

For the reasons explained above, it is respectfully recommended that the motion for class certification be denied.

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file timely objections may waive the right to appeal the District Court's order.  *See Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

SO ORDERED.

*/s/ Sanket J. Bulsara* August 12, 2020
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York